**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** _____  1:25-cv-59 Kleeh |
| | ) | |
| **MITCHELL B. STOTLAND,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

> ELECTRONICALLY
> FILED
> 6/26/2025
> U.S. DISTRICT COURT
> Northern District of WV

## COMPLAINT

The United States of America ("United States"), on behalf of the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), files this Complaint and alleges as follows:

## INTRODUCTION

1.      The United States brings this action to recover statutory damages and civil penalties under the False Claims Act ("the FCA"), 31 U.S.C. §§ 3729-3733, against Defendant Mitchell B. Stotland ("Stotland"). The United States also brings this action to recover all available damages and other monetary relief under the common law or equitable theories of unjust enrichment and payment by mistake of fact. The United States' claims arise out of the defendant's participation in an illegal scheme to knowingly submit, and cause to be submitted, claims to the Medicare program for items and services that were tainted by kickbacks and were otherwise false and fraudulent.

## PARTIES

2.      Plaintiff, the United States, brings this suit on its own behalf and on behalf of HHS

1

and CMS, which administer federal health care programs, Medicare and Medicaid, and the United States Department of Defense, TRICARE Management Activity.

3.     At all times relevant to this Complaint, Defendant was a physician.

4.     At all times relevant to this Complaint, Stotland was licensed by the State of West Virginia.

5.     At all times relevant to this Complaint, Stotland was a citizen of the United States and currently resides in Los Angeles County, California.

6.     Defendant currently also owns a residence in Morgantown, West Virginia and, as set forth below, transacted business and engaged in violations of the FCA within the Northern District of West Virginia.

## JURISDICTION AND VENUE

7.     This action is properly in the United States District Court for the Northern District of West Virginia pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345.

8.     Venue in the United States District Court for the Northern District of West Virginia is proper pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391.

9.     This is a civil action brought under 31 U.S.C. § 3730.

10.     In accordance with 31 U.S.C. § 3732(a), "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

11.     Under 31 U.S.C. § 3729, any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or

causes to be made or used, a false record or statement material to a false or fraudulent claim" or conspires to do so is liable to the United States.

## THE FALSE CLAIMS ACT

12.     Congress amended the False Claims Act, 31 U.S.C. §§ 3729-3733, via the Fraud Enforcement and Recovery Act of 2009 ("FERA"), P.L. 111-21, § 4(f), 123 Stat. 1621.

13.     The False Claims Act as amended by FERA provides, in pertinent part:

(a)     Liability for certain acts.

(1) In general.  Subject to paragraph (2), any person who -- (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . (G) . . . knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government.

(b)     Definitions.  For purposes of this section --

(1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information -- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud;

(2) the term "claim" (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that -- (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government -- (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729.

## THE ANTI-KICKBACK STATUTE

14.     The Anti-Kickback Statute ("AKS") prohibits any person or entity from knowingly and willfully offering, paying, soliciting, or receiving any remuneration, directly or indirectly, to induce or reward a person for, *inter alia*, purchasing, ordering, arranging for, or recommending the purchase or ordering of any goods or services for which payment may be made, in whole or in part, under a federal health program, including Medicare and Medicaid.  42 U.S.C. § 1320a-7b(b)(1)-(2).

15.     The AKS "seeks to ensure that referrals will be based on sound medical judgment and that providers will compete for business based on quality and convenience, instead of paying for . . . [referrals]."  OIG Advisory Op., No. 98-16 (Nov. 3, 1998).  The AKS is intended to prevent arrangements that can lead to the distortion of medical decision-making, overutilization of services and supplies, increased costs to federal health care programs, and unfair competition.  *See* 65 Fed. Reg. 59,434, 59,440 (Oct. 5, 2000).

16.     For purposes of the AKS, "remuneration" includes the transfer of anything of value, "directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. § 1320a-7b(b)(1).  In addition to the more obvious types of remuneration (*e.g.*, cash payments), the statute also prohibits less direct forms of payment, such as providing investment opportunities or equity interests, particularly under economic terms that make the investment extremely advantageous, or where the provider has a substantial financial interest in generating business for the company in which he or she invests.  *See* OIG Advisory Op., No. 97-5 (Oct. 6, 1997); *see also* Special Advisory Bulletin: Contractual

4

Joint Ventures, 68 Fed. Reg. 23,148, 23,150 (Apr. 30, 2003).

17.    The AKS's legislative history confirms Congress's intent to interpret the term "remuneration" broadly.  *See* 123 Cong. Rec. 30,280 (1977) (Statement of Rep. Rostenkowski), cited at 56 Fed. Reg. 35,952, 35,958 (July 29, 1991) (Final Rule regarding AKS Safe Harbors).

18.    The knowing and willful payment of remuneration to a physician — or the knowing and willful receipt of remuneration by a physician — violates the AKS when even one purpose of the transaction is to induce the referral — or generation — of federal health program related business.

19.    As codified in the Patient Protection and Affordable Care Act of 2010, the AKS provides that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320-a-7b(g).  This amendment to the AKS clarifies that "all claims resulting from illegal kickbacks are considered false claims for purposes of civil action under the False Claims Act."  155 Cong. Rec. S10854 (statement of Sen. Leahy).

## THE MEDICARE PROGRAM

20.    HHS is an agency of the United States government.  The activities, operations, and obligations of HHS are funded with federal monies.  Among the programs that the United States funds is the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, commonly known as the Medicare Program.

21.    The Secretary of HHS administers the Medicare Program through CMS.

22.     Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426-1, 426A.  Individuals who are insured under Medicare are referred to as Medicare "beneficiaries."

23.     The Medicare program is comprised of four parts: Part A, Part B, Part C, and Part D.

24.     Medicare Part A is not directly at issue in this case.

## MEDICARE PART B

25.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury.  45 U.S.C. § 1395u.

26.     Eligible individuals, who are age 65 or older or disabled, may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by HHS.

27.     Medicare Part B covers outpatient care, including physician services and ancillary services, such as clinical laboratory services, furnished by physicians and other providers and suppliers.  45 U.S.C. § 1395k.

28.     Medicare Part B only covers services, including diagnostic laboratory services, that are reasonable and necessary for the diagnosis or treatment of an illness.  *See* 45 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under [Medicare] part A or part B . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve functioning of a malformed body member."); 42 C.F.R. § 411.15(k)(1).

29.     Medicare is a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f) and a "health care benefit program" as defined in 18 U.S.C. § 24(b).

30.     Medicare was designed to pay only for services and items, such as laboratory tests and prescriptions, that were considered medically necessary, performed within accepted medical standards, and rendered for a legitimate medical purpose.

31.     Physicians are considered to be Medicare "suppliers" under applicable statutes and regulations.  *See* 42 U.S.C. § 1395x(d); 42 C.F.R. § 400.202.

32.     Medicare often makes payments directly to suppliers, such as physicians, rather than to the Medicare beneficiary, who is the patient.

33.     Medicare makes payments directly to suppliers when the beneficiary assigns to the supplier, and the supplier accepts assignment of, the right to payment.

34.     When a beneficiary has assigned the right to payment to the supplier, the supplier may submit its bill directly to Medicare, rather than to the patient, for payment.

35.     The United States provides reimbursement for Medicare claims through CMS.

36.     CMS, in turn, contracts with private insurance carriers called "Medicare Administrative Contractors" ("MACs") to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund (the Part B Trust Fund).

37.     In this capacity, the MACs act on behalf of CMS.

38.     Since April 1, 2015, the MAC in West Virginia has been Palmetto GBA ("Palmetto").

39.     The Medicare Program, through the MAC, pays a significant portion of approved claims, usually 80%.

40.     The Medicare beneficiary, or his or her supplemental insurance carrier, is required to pay the balance owed the supplier.  The beneficiary's payment is sometimes referred to as "co-

7

pay." Beneficiaries also pay deductibles.

41.     A supplier must sign a Medicare Provider Enrollment Application to enroll in the Medicare program.

42.     When a supplier signs a Medicare Provider Enrollment Application, the supplier agrees to learn and adhere to Medicare and other federal health care program laws, regulations, and program instructions.

43.     Medicare requires compliance with Medicare and other federal health care program laws, regulations, and program instructions as a precondition of governmental payment.

44.     The Provider Enrollment Application states, "I understand the payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations, and program instructions."

45.     All healthcare providers and suppliers must comply with applicable statutes, regulations, and guidelines, including those issued by the MAC, in order to be reimbursed by Medicare Part B.

46.     Medicare covers only reasonable and necessary medical services.  42 U.S.C. § 1395y(a)(1)(A).

47.     The Secretary of HHS is responsible for specifying services covered under the "reasonable and necessary" standard and has wide discretion in selecting the means for doing so. *See* 42 U.S.C. § 1395ff(a).  Typically, the Secretary acts through formal regulations and sub-regulatory guidance.

48.     The Secretary of HHS provides guidance to eligible providers pursuant to a series of Manuals, published by CMS, which are available to the public on the Internet.  *See generally*

CMS Internet-Only Manual (IOMs), *available at* https://www.cms.gov/medicare/regulations-guidance/manuals/internet-only-manuals-ioms.

49.     Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

50.     Providers and suppliers have a duty to provide services only when they are medically necessary.  42 U.S.C. § 1320c-5(a)(1).

51.     Providers and suppliers have an obligation to Medicare patients to render medical tests and services in an honest fashion.

52.     Medicare regulations exclude from payment services that are not reasonable and necessary.  42 C.F.R. § 411.15(k).

53.     To enroll in the Medicare program as a new enrollee, group practices and clinical laboratories must submit a Medicare Enrollment Application, Form CMS-855B.  These entities must also complete Form CMS-855B to change information or to reactivate, revalidate, and/or terminate Medicare enrollment.

54.     Form CMS-855B requires, *inter alia*, signatories to certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . .  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self Referral Law (Stark Law), 42 U.S.C. section 1395nn (Section 1877 of the Social Security Act)).
>
> \*     \*     \*
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claim with deliberate ignorance or reckless disregard of their truth or falsity.

*See* Medicare Enrollment Application, *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855b.pdf.

55.     An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program." *Id.*

56.     The National Provider Identifier ("NPI") is a standard and unique health identifier for health care providers. All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

57.     Typically, physicians are compensated for the services they provide to Medicare patients on a fee-for-service basis as determined by Medicare's fee schedule. 42 U.S.C. § 1395w-4. To obtain compensation, physicians must deliver a compensable service, certify that the service was medically necessary for the health of the patient, certify that the service was personally furnished by the physician (or under his or her immediate supervision), and determine the appropriate diagnosis and procedure code to describe the problem and service for billing.

58.     The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and NPI for the referring physician. 42 U.S.C. § 1395l(q)(1).

59.     In order to bill Medicare Part B, a physician must submit a hard-copy claim form called CMS 1500, or an electronic equivalent called the 837P format, to the MAC. 42 C.F.R. § 424.32(b). Among the information the provider or supplier includes on a CMS 1500 or through the 837P format are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes,

that identify the services rendered and for which reimbursement is sought, and the NPI of the "rendering provider" and the "referring provider or other source."

60.    Medicare requires compliance with the terms on the claim form as a precondition of governmental payment.

61.    When submitting claims to Medicare, providers certify on the CMS 1500, *inter alia*, that (a) the services rendered are medically indicated and necessary for the health of the patient; (b) the information on the claim form is "true, accurate, and complete;" and (c) the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws." Providers certify that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as the Stark Law)." CMS 1500 also requires providers to acknowledge that "[a]ny person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

62.    When the provider submits the claim form, the provider certifies that the services in question were "medically necessary and personally furnished by me."

63.    The claim form states, "No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations."

64.    MACs issue local decisions, called Local Coverage Determinations ("LCDs"), on

what procedures and services will be eligible for payment under the Medicare statute.

65.    At all times relevant to this Complaint, Stotland was an enrolled physician with Medicare.

## MEDICARE ADVANTAGE PROGRAM

66.    Under Medicare Part C, Medicare beneficiaries may opt out of traditional Medicare and instead enroll in Medicare Advantage ("MA") Plans to receive healthcare services.  *See* 42 U.S.C. §§ 1395w-21 to 1395w-28.  MA Plans are run by private insurers known as MA Organizations ("MAOs").  *See* 42 C.F.R. §§ 422.2, 422.503(b)(2).

67.    Under Medicare Part C, MAOs contract with CMS to provide healthcare plans called MA Plans to people who are eligible for Medicare Part C.  *See* 42 U.S.C. §§ 1395w-21 to 1395w-28.  MA Plans must provide Medicare beneficiaries all the services that they are entitled to receive from traditional Medicare, subject to limited exceptions.

68.    Many MAOs contract with hospital networks, physician groups, and other providers to furnish healthcare services under the MA Plans.

69.    MA Plans come in a variety of forms.  Some MA Plans are structured like a Preferred Provider Organization ("PPO") that offers a network of healthcare providers that a beneficiary can use for medical care and may see a specialist without a referral. Other MA Plans are structured like a Health Maintenance Organization ("HMO"), in which a MAO organizes a network of healthcare providers that a beneficiary may go to for healthcare services, and the beneficiary's primary care physician serves as the central point of contact.

70.    Medicare beneficiaries who enroll in an MA Plan are considered a member

of and enrollee in that Plan. In this Complaint, the terms beneficiaries, members, enrollees, and patients may be used interchangeably but mean the same thing, *i.e.*, individuals enrolled in Medicare or MA Plans.

## MEDICARE PART D

71.     In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. An individual is eligible to enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B. 42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

72.     Unlike coverage in Medicare Part B, Part D coverage is not provided within the traditional Medicare program. Medicare Part D is based on a private market model. Medicare contracts with private entities known as Part D Plan "Sponsors" to administer prescription drug plans. *See* 42 C.F.R. §§ 423.301, *et seq.*

73.     Every time a beneficiary fills a prescription covered under Medicare Part D, the Part D plan sponsor must submit a summary record called the prescription drug event ("PDE") data to CMS. The PDE data are summary extracts using CMS-defined fields, including the identity of the prescriber and the amounts paid for various components of the drug and related services, among other information. PDE data allows calculations and analysis of Medicare Part D plan sponsor expenditures.

74.     The PDE record is data summarizing the final adjudication of a Part D dispensing

13

event that are reported to CMS by the Part D sponsor using a CMS-defined file layout.[1,2]  PDE data submitted by Part D sponsors (or their submitters) is stored in the Integrated Data Repository ("IDR").

75.    Under the Social Security Act, Medicare only covers drugs that were dispensed upon a valid prescription and are used for a "medically accepted indication," which means a use that is approved under the Food, Drug, and Cosmetic Act, or is supported by inclusion in one of the specified compendia.  42 U.S.C. § 1395w-102(e)(1)(A); 42 U.S.C. §§1396r-8(g)(1)(B)(i) & (k)(6); 42 C.F.R. § 423.100.

76.    Part D plans may exclude drugs from payment if the drugs are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body part.  42 U.S.C. § 1395w-102(e)(3) (incorporating by reference 42 U.S.C. § 1395y(a)).

## DURABLE MEDICAL EQUIPMENT

77.    Certain orthotic devices or braces are covered under Medicare in accordance with section 1861 of the Social Security Act [42 U.S.C. § 1395x].

78.    Section 1861(s)(9) of the Social Security Act includes coverage for leg, arm, neck, and back braces, which includes knee braces, shoulder braces, and wrist braces.  In addition, durable medical equipment ("DME") is covered under a separate benefit category in accordance with section 1861(s)(6) of the Social Security Act and includes

---

[1] *See* 2011 Regional Prescription Drug Event Data Technical Assistance Participant Guide, section 1.5.2.1 Prescription Drug Event (PDE) (*available at* https://www.csscoperations.com/internet/csscw3.nsf/DIDC/FJUKANFCP1~Prescription%20Drug%20Program%20(Part%20D)~Training).

[2] The CMS defined fields are listed and described on the PDE Inbound File Layout, which is available at https://www.csscoperations.com/internet/csscw3.nsf/T/Prescription%20Drug%20Program%20(Part%20D)

ultraviolet light therapy systems. Suppliers of DME, prosthetics, and orthotics are sometimes referred to as "DMEPOS" suppliers or simply DME suppliers. DMEPOS is an acronym that includes items from several different Medicare benefit categories under section 1861 of the Social Security Act, including DME, prosthetic devices, prosthetics, orthotics, surgical dressings and other supplies.[3]

79.    Medicare covers DME or a brace only if it is medically necessary.

80.    Medically necessary means that the DME or brace is "needed to diagnose or treat an illness, injury, condition, disease, or its symptoms."  CTRS. FOR MEDICARE & MEDICAID SERVS., *Durable Medical Equipment & Other Devices*, at 18, *available at* https://www.medicare.gov/Pubs/pdf/11045-medicare-coverage-of-dme.pdf.

81.    The Office of Inspector General ("OIG") has issued Special Fraud Alerts to discuss "trends of health care fraud and certain practices of an industry-wide character." 59 Fed. Reg. 65,373 (Dec. 19, 1994), *available at* https://oig.hhs.gov/compliance/alerts/. The purpose of these alerts is "to provide general guidance to the health care industry" and to offer "additional insight to the Medicare carrier and fraud units in identifying health care fraud schemes."  *Id.*

82.    In 2003, OIG issued a Special Fraud Alert on Telemarketing by Durable Medical Equipment Suppliers.  Special Fraud Alert: Telemarketing by Durable Medical Equipment Suppliers (Mar. 3, 2003), *available at* https://oig.hhs.gov/compliance/alerts/.

83.    The 2003 Special Fraud Alert states that under § 1834(a)(17) of the Social Security Act, suppliers of DME are prohibited from making unsolicited telephone calls

---

[3] *See* 42 C.F.R. § 421.210.

to Medicare beneficiaries regarding the furnishing of DME unless: (i) the beneficiary has given written permission to the supplier to make contact by telephone; (ii) the contact is regarding a covered item the supplier has already furnished the beneficiary; or (iii) the supplier has furnished at least one covered item to the beneficiary during the preceding fifteen months. *Id.* Claims submitted for payment from claims generated pursuant to a prohibited telephone solicitation are false, and violators are potentially subject to criminal, civil, and administrative penalties, including exclusion from federal health care programs. *Id.*

84.    In 2010, OIG issued an update to the Special Fraud Alert on Telemarketing by Durable Medical Equipment Suppliers.  Special Fraud Alert: Telemarketing by Durable Medical Equipment Suppliers (Jan. 13, 2010), *available at* https://oig.hhs.gov/compliance/alerts/.

85.    The 2010 update states that OIG was aware of instances when DME suppliers contact Medicare beneficiaries by telephone based solely on treating physicians' preliminary written or verbal orders prescribing DME for the beneficiaries. *Id.* A physician's preliminary written or verbal order is not a substitute for the requisite written consent of a Medicare beneficiary. *Id.*

## CANCER GENETIC TESTING

86.    In order to receive Medicare funding, laboratory services must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), 42 U.S.C. § 263a, as set forth in 42 C.F.R. Part 493.

87.    "Clinical laboratory services involve the . . . examination of materials

derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition."  Medicare Benefit Policy Manual ("MBPM"), Pub. 100-02, Ch. 15 § 80.1, *available at* https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/bp102c15.pdf.

88.    Medicare regulations require that (1) laboratory tests must be ordered by the physician treating the patient for the treatment of a specific illness or injury; (2) laboratory test orders that are not individualized to patient need, or for which the need is not documented in the patient chart, are not covered services; and (3) claims for such laboratory services that do not meet these requirements are ineligible for payment and must be denied.  Medicare Part B pays for covered diagnostic laboratory tests that are furnished by a laboratory.  *See* 42 C.F.R. § 410.32.

89.    Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem.  Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."  The MBPM's "Requirements for Ordering and Following Orders for Diagnostic Tests" define an "order" as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary . . . . [T]he physician must clearly document, in the medical record, his or her intent that the test be performed."  MBPM, Ch. 15 § 80.6.1.

90.    Clinical laboratory services must also be used promptly by the physician

who is treating the beneficiary as described in 42 C.F.R. § 410.32(a). *See* MBPM, Ch. 15 § 80.1.

91.    To assess whether those services are reasonable and necessary and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. The Medicare statute provides:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period. 42 U.S.C. § 1395l(e); *see also* 42 U.S.C. § 1395u(c)(2)(B)(i) ("The term 'clean claim' means a claim that has no defect or impropriety (including any lack of any required substantiating documentation)").

92.    Medicare regulations expressly states that a laboratory's claim for a service will be denied if there is no sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary. 42 C.F.R. § 410.32(d)(3).

93.    Certain genetic tests use DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future or could inform treatment decisions for an individual with cancer. These genetic tests are not necessarily a method of diagnosing whether an individual presently has cancer.

94.    Except for certain exceptions, Medicare does not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

95.    With respect to cancer screening tests, Medicare generally covers "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

96.    Medicare does not cover diagnostic testing that is not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.  42 C.F.R. § 411.15(k)(1).

97.    If diagnostic testing is necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposes additional requirements before covering the testing.  42 C.F.R. § 410.32(a).

98.    Because cancer genetic testing does not diagnose cancer, Medicare only covers such tests in limited circumstances, such as when a beneficiary has cancer or the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer.  42 C.F.R. § 411.15(a)(1).

99.    Medicare does not cover cancer genetic testing for beneficiaries who do not have cancer or lack symptoms of cancer.  *Id.*

## TELEHEALTH AND TELEMEDICINE SERVICES

100.    Telehealth and telemedicine services are a means of connecting patients to providers through telecommunication technology, such as video conferencing.

101.    Telemedicine companies hire physicians and other medical professionals to furnish telemedicine services to individuals.

102.    Telemedicine companies pay "treating providers" a fee to consult with patients.

103.    To generate revenue, telemedicine companies bill the Medicare program or other health insurance programs.

104.    Medicare Part B covers expenses for specified telehealth services if certain

requirements are met.

105.    For coverage of telehealth services, Medicare Part B requires, *inter alia*, that: (a) the beneficiary is located in a rural area, meaning outside a "Metropolitan Statistical Area" or in a rural health professional shortage area; (b) the services were delivered through an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility – not at home – during the telehealth service furnished by a remote practitioner.  *See* 42 U.S.C § 1395m(m); 42 C.F.R. § 410.78.

106.    West Virginia law defines "telemedicine" as "the practice of medicine using tools such as electronic communication, information technology, store and forward telecommunication, audio only telephone calls, or other means of interaction between a physician or podiatrist in one location and a patient in another location, with or without an intervening health care provider."  WV Code § 30-3-13a(a)(4).

107.    "Telemedicine technologies" are defined as "technologies and devices which enable secure communications and information exchange in the practice of telemedicine, and typically involve the application of secure real-time audio/video conferencing or similar secure video services, remote monitoring or store and forward digital image technology, or audio only telephone calls to provide or support health care delivery by replicating the interaction of a traditional in-person encounter between a physician or podiatrist and a patient."  *Id.* § 30-3-13a(a)(5).

108.    West Virginia law requires a physician-patient relationship that cannot be established through text-based communications such as e-mail, internet questionnaires,

test-based messaging, or other written forms of communication. *Id.* § 30-3-13a(c)(1).

109.    If an existing physician-patient relationship does not exist prior to the use of telemedicine, West Virginia law provides that a physician-patient relationship can only be established through the use of telemedicine technologies that incorporate interactive audio using store and forward technology, real-time videoconferencing, or similar secure video services, or through the use of audio-only calls or conversations that occur in real time. *Id.* § 30-3-13a(c)(2)(A),(C).

110.    West Virginia law requires physicians who use telemedicine technologies to, *inter alia*, verify the identity and location of the patient; provide the patient with confirmation of his or her identity and qualifications; provide the patient with his or her physical location and contact information; establish or maintain a physician-patient relationship that conforms to the standard of care; determine whether telemedicine technologies are appropriate; obtain the patient's consent for the use of telemedicine technologies; conduct appropriate evaluations and history of the patient consistent with the traditional standards of care for the patient presentation; and create and maintain health care records for the patient that justify the course of treatment. *Id.* § 30-3-13a(d).

## FOOT BATH MEDICATIONS

111.    High-adjudication antibiotic and antifungal drugs ("high-adjudication foot bath medications") have been prescribed, purportedly, to treat a variety of fungal, bacterial, or other types of foot infections, and routinely include vancomycin 25 milligram capsules, calcipotriene 0.005% cream, clindamycin phosphate 1% solution, ketoconazole 2% cream, and other expensive drugs. Typically, the drugs selected for use in foot baths

did not require pre-authorization from Medicare prior to prescribing them to a beneficiary. Additionally, the majority of the drugs were not subject to utilization management, meaning that there was no limit on the quantity of drugs that could be ordered in a single prescription.

112.    In late 2019, Medicare, private insurers, and others issued alerts regarding foot bath schemes.  On November 20, 2019, CMS issued an alert on "Foot Baths and Soaks."  The alert, which was sent to Medicare Part D plans, stated that CMS "has been made aware of questionable prescribing and dispensing of multiple drugs (typically antibiotics and antifungal medications) that are being used in a foot bath.  Beneficiaries are provided a foot spa free of charge, with instructions from the pharmacy to mix the medications with water in order to soak their feet."  According to CMS, "[t]hese high-reimbursable medications . . . are often dispensed without medical necessity or pursuant to true medical relationships.  In addition, they may be of limited clinical value and may be harmful to patients, if used as dispensed."  The drugs "are typically provided monthly and are of limited clinical effectiveness in the manner they are being utilized by the beneficiaries.  Drugs such as oral capsules, ointments, and injections may be dispensed to beneficiaries to combine in the footbath.  These drugs may have limited ability to work topically in a footbath as prescribed and dispensed."

113.    The alert also stated that "[p]otential patient harm is a significant concern for these unapproved treatments.  Topical soaks are not the standard of care in treatment of foot infections . . . and could be actively harmful to the healing process."  Further, "harm can occur through patients being confused regarding atypical directions for drug

products which conflicts with typical drug information."  For example, "a beneficiary may mistakenly ingest vancomycin capsules orally . . . because this is the usual course of administration."  Such ingestion could cause "abdominal pain, nausea, and diarrhea by overgrowth of abnormal bacteria."  As another example of harm, "the development of systemic vancomycin resistance in a beneficiary through topical absorption in open wounds who may later need vancomycin for system intravenous (IV) use for a life threatening infection."

114.   The alert concluded that "[t]he purported indications for use of these combinations used in this manner, may not be medically accepted indications (MAIs) and are, at best, investigative and experimental treatments."

115.   Following the issuance of the CMS alert and other alerts, health care benefit programs began limiting coverage of high-adjudication foot bath medications and auditing providers who were identified as high-volume prescribers of such medications. In mid-2020, pharmacies and other providers largely ceased dispensing foot spas and began dispensing high-adjudication foot bath medications with different routes of administration besides a foot spa, such as combining the high-adjudication foot bath medications with solution into a spray bottle to be sprayed on beneficiaries' and members' feet or mixing the high-adjudication foot bath medications into a wash pan so that beneficiaries and members could soak their feet without the agitator provided by the foot spa.

## **ALLEGATIONS**

116.   At all times relevant to this Complaint, Stotland practiced under NPI

1245612969.

117.   At all times relevant to this Complaint, Stotland worked part-time for QuivvyTech, LLC.

118.   Through his employment with QuivvyTech, LLC, Stotland prescribed braces, DME, and UV light therapy to patients.

119.   Through his employment with QuivvyTech, LLC, Stotland also referred patients for gene analysis and genetic cancer testing.

120.   Stotland electronically signed the QuivvyTech prescriptions and transmitted them back to QuivvyTech.

121.   Stotland was paid by QuivvyTech, LLC per consultation.

122.   Stotland also provided his financial records to the United States for the time period of February 15, 2019, through July 31, 2020.

123.   Stotland's financial records showed that he received renumeration from several other companies during the time period from February 15, 2018 through July 31, 2020.

<u>DME and UV Light Therapy Claims</u>

124.   Some of the Medicare beneficiaries who were billed for DME by Stotland never received DME.

125.   The Medicare beneficiaries who never received DME stated that they had never spoken to Stotland, that they were not Stotland's patients, and that they did not know him.

126.   Some of the Medicare beneficiaries who were billed for DME by Stotland

did receive DME.

127.    The Medicare beneficiaries who received DME stated that they had never spoken to Stotland, that they were not Stotland's patients, and that they did not know him.

128.    From at least January 17, 2019, through on or about March 23, 2020, Stotland submitted or caused to be submitted at least 414 claims for DME to Medicare.

129.    From at least January 17, 2019, through on or about March 23, 2020, Stotland did knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is kickbacks, in return for ordering and arranging for and recommending ordering any good, service, and item, that is, DME, for which payment may be made in whole or in part under a federal health care program, that is, Medicare.

130.    As of today's date, Medicare paid at least $174,794.74 for DME claims that Stotland submitted or caused to be submitted, with this amount representing a viable single damages calculation for these claims pursuant to the FCA.

131.    Some of the Medicare beneficiaries who were billed for UV light therapy by Stotland never received UV light therapy devices.

132.    The Medicare beneficiaries who did not receive UV light therapy devices stated that they had never spoken to Stotland, that they were not Stotland's patients, and that they did not know him.

133.    From at least December 5, 2019, through on or about January 15, 2020, Stotland submitted or caused to be submitted at least 38 claims for UV light therapy to Medicare.

134.    From at least December 5, 2019, through on or about January 15, 2020, Stotland did knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is kickbacks, in return for ordering and arranging for and recommending ordering any good, service, and item, that is, UV light therapy, for which payment may be made in whole or in part under a federal health care program, that is, Medicare.

135.    As of today's date, Medicare paid at least $28,980.00 for  UV light therapy claims that Stotland submitted or caused to be submitted, with this amount representing a viable single damages calculation for these claims pursuant to the FCA.

<u>Genetic Cancer Testing and Gene Analysis Claims</u>

136.    Some of the Medicare beneficiaries who were billed for genetic testing by Stotland never received any test results from the samples that they submitted.

137.    The Medicare beneficiaries who never received any test results stated that they had never spoken to Stotland, that they had never provided any of their medical history to any physician, that they were not Stotland's patients, and that they did not know him.

138.    Some of the Medicare beneficiaries who were billed for genetic testing by Stotland did receive test results from the samples that they submitted.

139.    The Medicare beneficiaries who did receive results for genetic testing stated that they had given their medical history to a representative, not a physician.

140.    The Medicare beneficiaries who did receive results for genetic testing stated that they had never spoken to Stotland, that they were not Stotland's patients, and that

they did not know him.

141.    From at least January 15, 2019, through on or about November 12, 2019, Stotland submitted or caused to be submitted at least 763 claims for genetic testing to Medicare.

142.    From at least January 15, 2019, through on or about November 12, 2019, Stotland did knowingly and willfully solicit  and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is kickbacks, in return for ordering and arranging for and recommending ordering any good, service, and item, that is, genetic testing, for which payment may be made in whole or in part under a federal health care program, that is, Medicare.

143.    As of today's date, Medicare paid at least $1,709,564.33 for genetic testing claims that Stotland submitted or caused to be submitted, with this amount representing a viable single damages calculation for these claims pursuant to the FCA.

144.    From at least March 12, 2019, through on or about July 14, 2019, Stotland submitted or caused to be submitted at least 78 claims for gene analysis to Medicare.

145.    From at least March 12, 2019, through on or about July 14, 2019, Stotland did knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is kickbacks, in return for ordering and arranging for and recommending ordering any good, service, and item, that is, gene analysis, for which payment may be made in whole or in part under a federal health care program, that is, Medicare.

146.    As of today's date, Medicare paid at least $5,482.00 for gene analysis claims

that Stotland submitted or caused to be submitted, with this amount representing a viable single damages calculation for these claims pursuant to the FCA.

<u>Medicare Advantage Claims</u>

147.   On November 10, 2018, Stotland entered into an independent contractor agreement with CenseoHealth, LLC to provide medical services to CenseoHealth, LLC's clients on a locum tenens basis.

148.   Stotland was paid $100.00 for each completed member assessment that passed CenseoHealth Quality Assurance.

149.   CenseoHealth was acquired by Signify Health in 2018.

150.   In August 2019, a member filed a complaint alleging that Stotland's visit was not more than ten minutes, without taking any vitals and only writing a prescription for medication.  The member also alleged that Stotland stated that he did not have his identification or credentials because they were in his car and then stated that he had forgotten them at his home when the member followed him to his car.

151.   Also in August 2019, Stotland submitted an evaluation for a face-to-face meeting with a member that lasted for a total of fourteen minutes.

152.   Stotland did not complete any notes on the evaluation and did not obtain a signature from the member.

153.   After Stotland's coordinates were pulled, investigators discovered that Stotland was an hour and a half away from the member's home at the time of the appointment.

154.   In September 2019, the Regional Medical Director at Signify Health, spoke

with Stotland about the member complaints.

155.   Stotland stated that he was often running late to appointments because they were far from his residency.

156.   Stotland admitted to completing some assessments over the telephone rather than in person.

157.   Signify recommended that Stotland be removed from the field pending further investigation.

158.   As part of its investigation, Signify Health completed a survey of sixty members for whom Stotland had billed services.

159.   Signify Health asked each member whether Stotland had come to his or her home.

160.   Of the sixty members, only sixteen stated that Stotland had come to his or her home.

161.   Of the sixty members, three were unsure whether Stotland had come to his or her home.

162.   Of the sixty members, twenty members stated that Stotland had not come to his or her home.

163.   The remaining twenty-one members could not be reached.

164.   On November 4, 2019, Signify Health's Service Oversight Committee made the decision to administratively terminate Stotland as an independent contractor.

165.   On November 7, 2019, the Chief Medical Officer at Signify Health, sent a notice of termination to Stotland for his failure to adhere to company policies and

standards.

166.    In April 2020, two members filed complaints alleging that Stotland had completed telephonic assessments rather than onsite visits.

167.    These complaints were for visits in 2019 prior to Stotland's termination.

168.    Stotland's financial records, which he submitted to the United States, revealed that he received at least $23,490.00 for the locum tenens work, with this amount representing a viable single damages calculation for these claims pursuant to the FCA.

<u>Foot Bath Medication Claims</u>

169.    In August 2020, Express Scripts issued a complaint against Stotland with Qlarant.

170.    Express Scripts stated that it had reviewed the prescription claims profile of Stotland and found inappropriate prescribing of high cost oral and topical antibiotics, as well as topical anti-fungal, anti-inflammatory, and anesthetic preparations, some of which were instructed to be used in a foot bath.  Express Scripts had concerns about the high cost of the medications and patient safety.

171.    Express Scripts received a fraud tip concerning Stotland inappropriately prescribing high cost topical medications.

172.    Through its investigation, Express Scripts reviewed the prescription claims history for Stotland from June 2019 through July 2020 and found that he had authorized 808 total prescriptions and that 590 were for medications of concern.

173.    Express Scripts identified clindamycin, ketoconazole, and vancomycin as medications of concern because they are commonly used for medicated foot baths.

174.    Express Scripts cited to CMS' Fraud Conference and noted that medicated foot baths are not medically necessary and can harm patients.

175.    Data showed a vast difference in Stotland's prescribing practices as compared to his peers in West Virginia, and it showed that his prescribing for skin preps, antibiotics, anesthetics, and antifungals exceeded the national average as reported by Medicare.

176.    When Express Scripts contacted Stotland, he claimed that his credentials had been compromised.

177.    Stotland admitted that he was employed as an independent contractor for telemedicine services.

178.    When Express Scripts requested medical records for a sampling of patients, Stotland stated, "I cannot find records of an encounter with me of these patients."

179.    When Express Scripts inquired whether he had treated the patients through any platform, he stated, "Not that I could find."

180.    When Express Scripts reached out to patients who received medications of concern through Stotland, the patients responded that they did not authorize the medication and/or did not have a relationship with Stotland.

181.    Stotland stated that he was considering changing his NPI number because his credentials had been compromised.

182.    To date, Stotland's NPI number remains the same.

183.    From at least February 15, 2019, through on or about December 24, 2020, Stotland submitted or caused to be submitted at least 1,265 claims for Part D medications

to Medicare.

184.    From at least February 15, 2019, through on or about December 24, 2020, Stotland did knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks, in return for ordering and arranging for and recommending ordering any good, service, and item, that is, foot bath medications, for which payment may be made in whole or in part under a federal health care program, that is, Medicare.

185.    As of today's date, Medicare paid at least $1,521,689.48 for Stotland's Part D medication claims that Stotland submitted or caused to be submitted, with this amount representing a viable single damages calculation for these claims pursuant to the FCA.

## CLAIMS

### FIRST CAUSE OF ACTION
(False Claims Act: Presentment of False or Fraudulent Claims)
(31 U.S.C. § 3729(a)(1)(A))
(31 U.S.C. § 3729(a)(1))

186.    The United States re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

187.    Stotland knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including claims for reimbursement by Medicare, for services provided in violation of the Anti-Kickback Statute.  Among other things, Stotland knowingly submitted, or caused to be submitted, false claims for Medicare business that was obtained by means of, and as a result of, illegal kickbacks.

188.    Said claims were presented with actual knowledge of their falsity, or with

reckless disregard or deliberate ignorance of whether or not they were false.

189.    By virtue of the false or fraudulent claims made or caused to be made by Stotland, the United States has sustained damages in a substantial amount to be determined at trial and is entitled to treble damages, plus a civil penalty, for each violation.

### SECOND CAUSE OF ACTION
(False Claims Act: Making or Using False Record or Statement)
(31 U.S.C. § 3729(a)(1)(B))
(31 U.S.C. § 3729(a)(2))

190.    The United States re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

191.    Stotland knowingly made, used, or caused to be made or used, false records or false statements material to getting false or fraudulent claims paid or approved by the United States.

192.    The false records or statements were Stotland's false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent and false reporting, including, but not limited to, the Anti-Kickback Statute.

193.    Stotland's false certifications and representations were made for the purpose of getting false or fraudulent claims paid, and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of Stotland's statements and actions.

194.    The false certifications and representations made and caused to be made by Stotland were material to the United States' payment of the false claims.

195.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

196.    By virtue of the false or fraudulent claims made or caused to be made by Stotland,

the United States has sustained damages in a substantial amount to be determined at trial and is entitled to treble damages, plus a civil penalty, for each violation.

**THIRD CAUSE OF ACTION**
(False Claims Act: False Record Material to Obligation to Pay)
(31 U.S.C. § 3729(a)(7))
(31 U.S.C. § 3729(a)(1)(G))

197.    The United States re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

198.    Stotland made and used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

199.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

200.    By virtue of the false or fraudulent claims made or caused to be made by Stotland, the United States has sustained damages in a substantial amount to be determined at trial and is entitled to treble damages, plus a civil penalty, for each violation.

**FOURTH CAUSE OF ACTION**
(Unjust Enrichment)

201.    This is a common law claim for unjust enrichment.  This Court has jurisdiction pursuant to 28 U.S.C. § 1345.

202.    The United States re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

203.    As a consequence of the acts set forth above, Stotland was unjustly enriched and received illegal profits.  The United States conferred benefits upon Stotland, Stotland knew of and appreciated these benefits, and Stotland's retention of these benefits under the circumstances would be unjust as a result of their respective conduct.

204.    The United States therefore claims the recovery of all monies by which Stotland has been unjustly enriched and have illegally profited, in an amount to be determined, which in equity should be paid to the United States.

**FIFTH CAUSE OF ACTION**
(Payment By Mistake)

205.    This is a common law claim for payment by mistake.  This Court has jurisdiction pursuant to 28 U.S.C. § 1345.

206.    The United States re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

207.    This is a claim for the recovery of monies paid by the United States as a result of mistaken understandings of fact.

208.    The false claims that Stotland caused to be submitted or submitted to the United States were paid by the United States based upon mistaken or erroneous understandings of material fact.

209.    The United States, acting in reasonable reliance on the truthfulness of the claims, paid for claims for rendered by Stotland, who was in a financial relationship prohibited by the Anti-Kickback Statute without knowledge of material facts, and under the mistaken belief that the claims were valid when they were not.

210.    At the time the United States made such payments, the United States was unaware

of Stotland's respective conduct described in the preceding paragraphs.   The United States' erroneous belief was material to making the payments at issue.   Had the United States known of the conduct at issue, it would not have made the payments it did.

211.   As a result of the acts set forth in the preceding paragraphs, the United States has been damaged in an amount to be determined at trial, and is entitled to recover those monies that were paid by mistake.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests that judgment be entered in its favor and against Stotland as follows:

On the First, Second, and Third Causes of Action under the False Claims Act, against Stotland for the amount of single damages ($3,464,000.55), statutorily trebled as required by law, and such civil penalties, fees and costs, as provided by law, together with all such further relief as may be just and proper.

On the Fourth and Fifth Causes of Action, for unjust enrichment and payment by mistake, for the damages sustained and/or amounts by which Stotland was unjustly enriched or by which Stotland retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

- JURY TRIAL DEMANDED -

Dated: June 26, 2025                    Respectfully submitted,

                                        FOR THE UNITED STATES OF AMERICA:

                                        RANDOLPH J. BERNARD
                                        ACTING UNITED STATES ATTORNEY

                         By:     /s/ *Stephanie K. Savino*
                                 Stephanie K. Savino
                                 Assistant United States Attorney
                                 WV Bar No. 13684
                                 United States Attorney's Office
                                 P.O. Box 591
                                 Wheeling, WV 26003
                                 Phone:  (304) 234-0100
                                 Fax:  (304) 234-0112
                                 E-mail: Stephanie.K.Savino@usdoj.gov

                                 /s/ *Christopher J. Prezioso*
                                 Christopher J. Prezioso
                                 Assistant United States Attorney
                                 WV Bar No. 9384
                                 United States Attorney's Office
                                 P.O. Box 591
                                 Wheeling, WV 26003
                                 Phone:  (304) 234-0100
                                 Fax:  (304) 234-0112
                                 E-mail: Christopher.J.Prezioso@usdoj.gov